Good morning, Your Honor, and may it please the Court. My name is Elizabeth Austin Bonner, and I am court-appointed counsel to George M. Pasion. And with your permission, I'd like to reserve two minutes of my time for rebuttal. So as the State's own authorities made clear, intent and state-of-mind questions are notoriously not readily susceptible to early resolution at the motion-to-dismiss or summary judgment stage. And here, Mr. Pasion's claims turn entirely on state-of-mind questions. Can I ask you just one clarifying question before you start? There were two other defendants, McGuire and Singh. Are you representing them on appeal? Or just clarify for me state of representation with regard to those particular parties. Yes, Judge Oliver. So my understanding is that under the PLRA, it's quite common that the defendants there, because they were never served, wouldn't be represented at this stage. So if you reverse the screening motion-to-dismiss finding, they would then be served and then have the opportunity to bring their own dispositive motions. All right. So here at this early stage in the proceedings, and particularly in light of the liberal construction to which my client is entitled as a pro se prisoner, it's clear that he's done what he needed to do in the complaint and at the summary judgment stage to establish both the retaliatory intent of all three of the prison officials in question and the fact that they acted with pretext. So turning first to Captain Compell, who is represented here today, Captain Compell enters the proceedings here with regard to the grievance sort of in the middle of the action. So Lieutenant McGuire first makes the determination that Mr. Pasion will be put in the Ministry of Segregation. And then under the regulation, specifically Section 3337, Captain Compell is then required to review that determination. And several things happen, we think, that show both retaliatory intent at that stage and the fact that the proffered reasons were pretextual. First, we would consider the timing of the administrative segregation determination. That seems like the most likely piece of circumstantial evidence a client like yours would have in this situation. But I guess I didn't see the timing as all that suspicious. It would be different, I suppose, if the investigation had started, you know, back when he first filed the complaint and, you know, he had been allowed to go on about his business for months and months and months. But that's really not what happened here. It seems like there was this long delay, for whatever reason, before the investigation started. And so maybe you can help me see why the timing here is in any way suspicious. So I think that your point there, that there had been a long delay, actually is what creates the suspicious timing. So here, by the time the grievance proceedings reach Lieutenant McGuire and then Captain Compell, this complaint has been in the ether for eight months. And so at that time, it would have been already clear that my client either posed a danger to others, as was the explanation that Lieutenant McGuire offered, was interfering with investigation of his complaint. But there was no investigation. That's my point, right? The investigation didn't start until right before he was placed into, is it called administrative segregation? I can't remember the term. So there had been other inquiries into the events that had happened. But you're correct that those were being treated as medical issues rather than staff issues. At the same time, the events had occurred long in the past. So if there, for example, had been a conflict that arose at that time between the prison officials involved in the fight that is the beginning of this process, that would have been apparent at the time. But it wouldn't have been because no one, from what I gather, tell me if I'm wrong, nobody within the prison interpreted him as basically pointing the finger at the officers. They thought that he was pointing the finger at, I don't know, the medical personnel who didn't give him adequate treatment, right? So I think there are two responses to that. The first is at each stage where this was treated as a medical problem, Mr. Passione attempted to push back on that. And that's where you see Assistant Warden Singh sort of first enter the discussion, is making that original determination that it was not a staff complaint. But additionally, I think that by the time you reach Captain Compel, it's important to note that at each of those earlier phases, if you look at the documents, you'll see that the captain is copied on each of them. He's copied by title and not by name. So he would have been aware of the proceedings as they were arriving to him over those months. Okay, but you tell me then when this formal investigation started that he might have been able to interfere with. Because I didn't think it happened until February of 2009. But what earlier point do you say that there was some formal investigation underway? So you're correct that the formal investigation, which included the interviews of Valdez and Freitas, does begin around February 13th. But I don't think that there's any indication that Mr. Passione was interfering with that process. In fact, it's entirely the other way. The witness that Mr. Passione brought was initially willing to talk, and then after he'd had contact with prison officials, decided he preferred not to continue speaking. And I want to make clear that timing is not the only point about Captain Compel that we would offer. The second refers to the discussion that was the interview before Captain Compel made the decision to retain Mr. Passione. And there I think it's important to point out that the government, in its brief, sort of reverses the order of events as they happen during that interview. Actually, it's clear from the deposition that my client gave, and that's in the record at ER 114, that he was initially asked at the beginning of the interview to describe his complaint, what had happened, what he was complaining of. Then later in the interview, Captain Compel asked him in a hostile tone and an angry voice, will you withdraw this complaint? I think that's entirely different from the district court, the magistrate judge's supplied explanation, which was that how would Captain Compel know if he wanted to continue without asking him? Well, clearly he would have, because he had just asked him, had him explain his complaint, and then asked him to withdraw it later in the discussion. And that circumstantial evidence, the tone and tenor of that discussion, is almost completely ignored in the Attorney General's briefing. And while that may be disputed evidence, that means it's a disputed fact that should be resolved by a jury. A jury can hear evidence about the tone and tenor of the discussion between the two people and come to a conclusion about what the intent was. Additionally, with regard to Captain Compel, we'd like to discuss pretext. So here, it was my client's burden to show the lack of a legitimate peniological purpose. But it's clear from our case law, particularly from Bruce, that legitimate peniological purpose can't be a ruse or a cover for retaliation. And here my client has alleged that. He's alleged it directly. He's also shown that other circumstantial evidence of pretext. So one of those kinds of circumstantial evidence would be the changing explanation between the prison officials. Here, at each stage of appeal, a different reason for his being assigned to and then retained in administrative segregation is proffered. It's a solution in search of a problem at that time. So Lieutenant McGuire first says that Passione is a danger to other people and therefore must be put in administrative segregation. Then Captain Compel offers a slightly different explanation in his declaration. He makes clear that his reasoning related to the investigation. Then, upon arriving at the ICC where Warden Singh is involved, the reasoning changes again. He says that now he believes that prison officials are a danger to Passione. At each of these stages, we think there's not support for those various rationales, but I think it's also important to look at them together and see that all three prison officials involved came up with different reasons. And I see that my time is running down here. If you have no further questions, I'll come back up on rebuttal. Okay. Yeah, we'll give you some adequate time on rebuttal. Let's hear from the defendants now. Let me clarify before you start. I asked the question of appellant, but I should have been asking it of you as I thought about that and whether you were representing the two other defendants. Let me just clarify that. Yes, Your Honor. May it please the Court. Jose Solan Sepeda, Deputy Attorney General for Defendant Compel. The answer to your question is that the Attorney General's Office represents only Captain Compel because, as my opposing counsel mentioned, the other two individuals were not served by the court and, therefore, have not obtained counsel. Nevertheless, because the issues kind of merge between the claims and the individuals and the events are so intertwined, we'd urge the Court to affirm the district court's dismissal of those defendants as well. This case highlights the peril that prison officials face in enforcing a prison regulation and how an inmate can turn any administrative action into a constitutional claim merely by labeling it retaliation. As Judge Watford pointed out, the point at which Mr. Passione was placed in administrative segregation, which was the allegedly adverse action, was when he became clear to prison officials that he was making serious allegations of misconduct. And when that happens — Well, that only helps you if, in fact, the stated reason for putting him in administrative segregation was to protect the integrity of the investigation. But as your opponent just pointed out, there was actually quite a range of shifting rationales, a couple of which made no sense whatsoever. A couple of points on that. Opposing counsel made a point about how different individuals made different rationales for that. What's at issue here is the claim up against Captain Capell, because he's the only one that — it's his motivation that's at issue here. What other individuals might have said, they might have had different reasons for their reasons, their decisions along the way, because different individuals have different roles along the way in assessing whether Mr. Passione should have been kept in administrative segregation. The triggering point was on February 13, 2009, when — Let me just follow up, and sorry to interrupt. But even if you take Capell's rationale, I guess, what is there in the record to suggest that there was a need to protect this particular plaintiff, this defendant, this plaintiff? I mean, what is there in the record to support that? Your Honor, the regulation that's at issue is a prophylactic measure that's in place there in order to prevent a number of different types of problems when an inmate makes misconduct allegations. I understand. But you would not argue that in every single case that you would put a person in administrative segregation when they file a complaint, would you? Your Honor, I wouldn't do that because it's not my place to be making those determinations. It's up to the prison officials who are — Does it happen all the time in the experience of the prison officials that when a complaint is filed, they automatically place a person in administrative segregation to protect the person and the integrity of the investigation? I can't say that it happens every single time. I can say that in the majority of the time it does happen. What happens is, as a matter of course in prison, inmates make allegations against individuals, prison correctional officers that they have contact with on a day-to-day basis. And as a result, if the inmates have constant contact with those same individuals, any particular action could be perceived as being adverse and part of the retaliation or as part of misconduct. And therefore, the regulation is there in place to make sure that that doesn't happen, that the inmate is insulated from the staff member, the staff member is insulated from the inmate. It's also there to prevent witness tampering. It's also there to prevent that type of added friction because a particular prison officer or correctional officer is having contact with the same inmate who's making these serious misconduct allegations. I understand the rationale is trying to get a sense of how it operates. In a sense, do you think that the statute requires that prison officials administratively segregate a prisoner when a complaint is filed? Or do you think there is discretion? There is discretion, Your Honor, and the way the statute, the regulation is worded, it says if prison officials determine that the conditions preceding are met, then the inmate shall be placed in administrative segregation. And so it's up to the individual officers who are there at that point to make that determination. And it's not only one individual who makes that determination. As happened in this case, one, it was Lieutenant McGuire who made that determination initially and prepared a notice informing Mr. Passione of the reasons why he was being kept there. And then it's reviewed within 72 hours by a superior officer, in this case Captain Capel, but that was done. So there's two levels of review up until that point. And then within a certain period, in this case less than a week later, a classification committee of three individuals reviewed that placement and said, do we think this is appropriate? And I submit to the Court that that shows how reasonable the procedure is. It doesn't lend itself to one particular individual doing this for retaliatory reasons or for some sort of punishment reasons. It's an administrative determination that's there to try to insulate further friction being caused between the inmate and the staff that he's accusing of misconduct and also to cause further to prevent further problems. So you're saying that there was an individualized determination in this case and that it's supported by the record evidence? Yes, Your Honor. That was, that's my argument. And that's borne out by the 114 placement notice that Lieutenant McGuire prepared. Why isn't there a material issue of fact as to this question that, I can't remember his title, but is it officer? Captain Capel. Sorry, I knew it was something more important than officer. Captain Capel asked the plaintiff in a hostile tone, which sounds, I mean, why couldn't a reasonable jury infer from that that he was basically threatening him to say, look, pal, if you don't withdraw this, you know what's going to happen. Your Honor, there's a couple of things on that point. The actual testimony under penalty of perjury that the plaintiff submitted was that I don't recall it being characterized as a hostile tone or an angry voice, but I understand it's a matter of characterization. As a practical matter, Your Honor, prison is a loud place. Correctional officers, inmates talk very loudly. It's hard to gain any kind of sense of an intent of an individual based on that alone. And if you go back to the case law, timing alone is not enough to show evidence of retaliatory intent. This Court's recent decision in the column versus CDCR highlights that, that because it's timing alone, it's so easy to find that type of evidence, it has to be supported by other types of evidence, such as evidence that the proffered reason was pretextual or that there was a – there's evidence that the defendant showed an opposition to the speech. In this case, what you have is Captain Coppell reviewing someone else's initial determination that Mr. Passione had to be placed in administrative segregation while the investigation took place, and then asked him as a procedural matter, well, are you going to keep your investigation? Oh, that's your spin, right? And that's Captain Coppell's spin. I know that that's what he testified. He was just saying, hey, I just wanted to make sure before you have to suffer this pretty miserable conditions of confinement, I just wanted to make sure you really wanted to go forward with that. I'm just saying the plaintiff, obviously, is offering a different characterization, and why couldn't a reasonable jury say, well, we believe the plaintiff's version? Because, Your Honor, at the summary judgment stage, the plaintiff had to come forth with evidence of that under the case law, and I am unaware of any cases in Plaintiff Assided None where timing plus allegedly loud tone or angry tone, absent evidence that it was that it showed an opposition to the plaintiff's speech, that that is enough to create a triable issue of fact on the timing, on the retaliatory intent element. Also, the Supreme Court relatively recently, and this Court, the Supreme Court in Hartman v. Moore, and this Court in Lacey v. Coney, Maricopa, explained that in trying when an inmate, when an individual makes a retaliation claim, it's not enough to show that retaliatory intent was an element or a reason for the defendant to taking the actions complained of, that it had to be the but-for cause of that particular action. And in any event, I wanted to go forward. Counsel, Judge Gould, if I could interject a question, please. What is the standard under the regulation that governs someone like Officer McGuire or Capel in reviewing it as to whether they should place the prisoner in segregation? The regulation basically says if an individual makes a determination that the inmates' continued stay in their general population will pose certain risks, then that the inmates shall be housed in administrative segregation. And the specific types of situations is if the officer finds that the inmates' continued housing in general segregation, general population will cause a danger to the institution or to himself, whether it will endanger the investigation, and I think one other one that's that I'm missing at that point, and then as I was making the point earlier, that's reviewed by a superior officer within 72 hours, and then that is further reviewed by a classification committee of three prison officials within a certain period of time as well. I see that I'm out of time. If I can just go ahead and make a couple of brief points. We spent a lot of time on the motivation aspect of retaliation, but plaintiff still has to Okay. Thank you very much. Let's give plaintiff's counsel two minutes for rebuttal. Thank you, Your Honor. There are three points that I want to make on rebuttal, and the first is about the regulation that we've been discussing. So Section 3335 carefully limits the use of administrative segregation because it's a serious remedy, and it requires factual findings. It's certainly not the case that every time an investigation is started that administrative segregation is automatic. We think that those factual findings are right for pretext and that the particular context here shows, since no one could seem to decide which of those three issues it was, that there is a pretextual motive here. How do you briefly respond to opposing counsel's argument that there was a process and it was a three-step process? What's your response to that, to determine whether or not he should be administratively segregated? Yes. So it's certainly true that under the regulation there is a three-step process, but each of the officials at those three steps has an independent duty to make sure that the regulation is being followed. So at the time that Lieutenant McGuire's report reaches Captain Capell, Captain Capell's job is to make sure that Lieutenant McGuire has properly followed the regulations for administrative segregation. He reviewed that file, he interviewed my client, and then came to a different reason but without explanation. And Captain Capell's declaration on summary judgment doesn't do anything to further explain why that reasoning would have been different. It merely recounts in sort of conclusory terms the language that's virtually identical to the language that's in the regulation. Next, I'd like to point out that we don't see this as a mixed motive case, and I think that that's what the arguments about the but-for causation are going to. Our argument is not that there were many motives out there and one of them was pretext. Our argument is that pretext was the reason for offering these explanations that are consistent with the regulation. And I see that my time is expiring. If there are any other questions. You had three points. Did we give you a chance to make all three? My final point is just to point out that the discussion from my client's declaration is in the record at ER 68. He uses the terms aggressive and loud. Okay. Thank you very much. Thanks very much. The case just argued will stand submitted. And we'd like to extend a special thanks to counsel for the plaintiffs who I understand accepted a pro bono appointment to handle this case. We are very appreciative of your efforts. And as I said, the case just argued will be submitted. Thank you very much. Judge Watford, can I ask a question of counsel for plaintiffs? If we were to – if we decided to grant relief and send this case back, does your firm's commitment extend past the appeal? So my understanding is that under the rules of the Ninth Circuit's pro bono program, we were only allowed to agree to handle this appeal and a potential petition for re-hearing if my client requested, so that any future arrangement would have to be both negotiated under a different agreement. And from the district court, probably. I think so. Okay. Thanks. Thank you. Okay. Thanks. All right. Let's move to the second case on the calendar, which is United States v. Ifinitura, if I'm pronouncing that right.
judges: Oliver, Gould, Watford